**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
| :
PACIFIC CAPITAL BANK, N.A., d/b/a SANTA :
BARBARA BANK & TRUST,                                    :          Civil Action No. 08-0223 (FLW)
| :
Plaintiff,                         :
| :
v.                               :
| :                          **OPINION**
ANNE MILGRAM, in her official capacity as      :
Attorney General of the state of New Jersey, ___:
et al.,                                                                 :
| :
| :
Defendants.                    :
_____:

**WOLFSON, District Judge:**

On January 11, 2008, New Jersey Governor Jon Corzine signed into law the N.J. RAL
Statute, that limits national banks in offering, facilitating, and making Refund Anticipation
Loans ("RALs")(the "Statute").[1]  Specifically, the Statute imposes, among other measures,
a maximum interest rate on all RALs in the state of New Jersey, and subjects those who
violate the Statute to civil penalties and criminal prosecution.  According to the terms of the
Statute, it takes effect on April 1, 2008.  Plaintiff Pacific Capital Bank, N.A., d/b/a Santa
Barbara Bank & Trust ("Plaintiff" or "Pacific Capital") challenges the constitutionality of the
Statute, in the instant summary judgment motion, by contending that the Statute is
preempted by the National Banking Act ("NBA").  Defendants, Anne Milgram, in her official
capacity as the Attorney General of the State of New Jersey (the "Attorney General"), and
Steven M. Goldman, in his official capacity as the Commissioner of Banking and Insurance

_____

[1]This Act supplements Title 17 of the Revised Statutes of New Jersey.

for the State of New Jersey (the "Commissioner")(collectively, "State Defendants"), oppose the motion, and have cross-moved for summary judgment, arguing that the criminal provision of the Statute is a proper exercise of the State's legitimate police power, and thus should survive preemption, while conceding that the Statute's civil penalties and limitations regarding interest rates as applied to national banks and third party tax preparers, who facilitate the RALs on the banks' behalf, are preempted by the NBA. While the Court appreciates what has motivated the State's initiative, concerns for consumers who are subjected to high interest RALs, relief lies with Congress, not with the Court. For the reasons set forth herein, Plaintiff's motion is granted, and the criminal and civil provisions, <u>N.J. RAL Statute</u> §§ 3a and 5, imposing limitations on interest rates of RALs and fines are preempted by the NBA, and therefore invalid.

## BACKGROUND

The facts of this case are undisputed and relatively straightforward. RALs are loans secured by, and repaid directly from the proceeds of a consumer's federal income tax refund from the Internal Revenue Service ("IRS"). Customers, who have their tax refund prepared by a tax preparation business that offers RALs, may elect to receive an RAL immediately after their taxes have been estimated and filed, instead of waiting for their tax refund from the IRS. The loans are usually outstanding for 7 to 14 days.[2] RALs generally target the working poor and low-income taxpayers. According to IRS data, 83% of RAL applicants in 2005 had adjusted gross incomes of $35,000 or less. The IRS further shows that in 2005

---

[2]The statistical figures and general background on RALs are cited from a report by Chi Chi Uw and Jean Ann Fox of the NCLC and CFA, titled: <u>One Step Forward, One Step Back: Progress in Efforts Against High-Priced Refund Anticipation Loans, But Even More Products Introduced</u>, (Jan. 2007) ("NCLC Report"). The Court takes judicial notice of these facts.

over 60% of RAL borrowers received the Earned Income Tax Credit ("EITC"), a refundable credit intended to boost low-wage workers out of poverty.  In contrast, EITC recipients made up only approximately 17% of the 2005 individual taxpayers who filed returns.  Based on these figures, EITC recipients are vastly over represented among the ranks of RAL consumers.[3]  While some consumers have ways to obtain short-term unsecured loans, such as credit cards, many of the poor and near-poor lack access to traditional sources of credit.  As such, the convenient nature of RALs attracts these particular consumers.[4]

Pacific Capital is a national bank, with its main office and principal place of business in the state of California, organized and existing under the NBA, which is enforced by the Office of the Comptroller of the Currency ("OCC").[5]  Since at least 1993, Plaintiff has offered RALs to customers in New Jersey.  While the customers are normally apprised of the fees and charges prior to agreeing to accept the RAL, RALs are associated with high interest rates.  To calculate the charge for the RAL, Plaintiff uses a fixed-tiered fee schedule.  The prepaid RAL fee varies by the amount of the funds advanced.  Mr. Turner's Decl. at ¶ 3.  The average RAL fee from the past year was 2.5% of the loan, but the fee does not exceed $95.  Id.  However, pursuant to the Truth in Lending Act, Plaintiff must disclose an APR amount, which is calculated by charging the cost of the loan every eleven days over the course of the

_____

[3]According to the previous 2004 NCLC Report, consumers paid an estimated $1.14 billion in RAL fees and an additional $406 million in administrative or electronic filing fees in 2002 to get quick cash for their refunds.

[4]See Lynn Drysdale & Kathleen Keest, The Two Tiered Consumer Financial Servies Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury Laws in Today's Society, 51 S.C.L. Rev. 589 (Spring 2000).

[5]The following facts are supported by the Declaration of Mr. Richard H. Turner, Senior Vice President and RAL Program Manager of Santa Barbara Bank & Trust ("Mr. Turner's Decl.").

year (or thirty-three times a year).  This eleven-day period must be used because, according to the IRS, it is the average period of time that a taxpayer with a bank account can receive an electronic deposit of his or her refund.  This calculation yields an average APR of 115%.  Id. at 16.

All RALs offered by Plaintiff in the State of New Jersey are facilitated through tax preparation businesses because Plaintiff does not maintain any branches in the State.  Plaintiff makes no substantive decisions in the customer's tax return preparation service; the responsibility remains solely with the customer and the tax preparation service.  The tax preparation business transmits the customer's RAL request to Plaintiff once the tax refund has been determined by the tax preparation business.  Plaintiff then determines whether to issue the loan based upon the customer's tax refund information.  Once approved, the taxpayer may receive a paper check, which is issued by Plaintiff and provided to the customer at the place of business of the tax preparation service.  Id. at ¶ 10.  The taxpayer can also receive the RAL through direct deposit, payroll cards, and cash cards.  Id. Plaintiff also can create a temporary bank account for those taxpayers without a bank account in order to facilitate the loan applicant receiving the cash more quickly.  Id. at ¶ 17.  However, with the last option, the customers are charged a fee, in addition to the fee charged for the RAL.

In an effort to curtail such practices, New Jersey enacted the New Jersey RAL Statute.  The Statute aims to protect consumers from being charged with exceedingly high RAL interest rates and has three substantive provisions which are at issue here.[6]  First, it

---

[6]N.J. RAL Statute also imposes other disclosure and notice requirements which are not being challenged in this matter.  See N.J. RAL Statute §§ 2, 3b, 3c, 3d and 4.

mandates that the "tax preparers" shall not "[c]harge, offer to accept, or accept a fee based on a percentage of an anticipated refund in exchange for tax preparation services." N.J. RAL Statute § 2k.  Second, it provides a maximum permissible interest rate for RALs by requiring that all "tax preparers" that offer, facilitate or make RALs comply with the provisions of the New Jersey Licensed Lenders Act (the "Lenders Act"), N.J.S.A. § 2C:21-19. See N.J. RAL Statute § 3a.  The Lenders Act, in turn, provides that all loans to individual consumers may not exceed a 30% APR, and subjects lenders who violate this provision to criminal charges.  N.J.S.A. § 2C:21-19a.  Third, in addition to criminal charges, the Statute imposes civil penalties of up to $1,000 for each RAL that violates its terms.  See N.J. RAL Statute § 5.  As will be discussed later in this Opinion, as a result of the Statute's broad definitions, Plaintiff and third party tax preparers alike are subject to all of the Statute's restrictions on RALs, including civil penalties and criminal charges.

Initially, Plaintiff filed a motion for a preliminary injunction to enjoin State Defendants from enforcing the statutory provisions at issue, and it ultimately challenges these provisions based on federal preemption by the NBA.  On February 28, 2008, the Court held a teleconference with counsel for the parties to streamline the issues in light of the filed submissions.  Specifically, counsel for the State Defendants stipulated that their opposition will only apply to the criminal provision of the Statute, as counsel agree that the civil penalty provision and the imposition of the maximum allowable interest rate on RALs, as it applies to national banks as well as tax preparation businesses which facilitate RALs on behalf of national banks, are preempted by the NBA.  See Joint Stipulation at ¶ 4.  Pacific Capital stipulated that it does not challenge any other portions of the Statue in this matter. See Joint Stipulation at ¶ 3.  Furthermore, both parties agreed that no discovery is

necessary, and that the Court should decide this preemption issue as a matter of law.  As such, Plaintiff's motion for preliminary injunction is converted to one for  summary judgment, and State Defendants' opposition will be considered as a cross-motion for summary judgment.  See Joint Stipulation at ¶ 2.  Consistent with the stipulations, the Court entered a Consent Order dated March 7, 2008.  Accordingly, in this Opinion, the Court will only analyze the NBA's preemptive effect on the criminal provision of the Statute.

## DISCUSSION

I. Standard of Review

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d

238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002)(citations omitted).

      II.  <u>Preemption of the Statute's Criminal Provision</u>

      The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that "the Laws of the United States . . . shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Federal Statutes and the regulations adopted thereunder have equal preemptive effect.  <u>Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 153 (1982).

      The federally instituted National Bank Act and the regulations implemented by the OCC establish and govern the activities of national banks as Congress has plenary authority to regulate and control the operations of national banks pursuant to the Necessary and Proper Clause and the Commerce Clause of the United States Constitution.  <u>See</u> <u>McCulloch v. Maryland</u>, 17 U.S. 316, 409 (1819).  Congress and the OCC have authorized national banks, including Plaintiff, to exercise all powers "as shall be deemed necessary to carry on the business of banking," including powers incidental to lending.  <u>See</u> 12 U.S.C. §§ 24, 85.  The Supreme Court has consistently recognized that this grant of incidental power is a "grant[] of authority not normally limited by, but rather ordinarily pre-empting, contrary state law."  <u>Barnett Bank of Marion County, N.A. v. Nelson</u>, 517 U.S. 25, 32 (1996).  Thus, a state law is preempted by the NBA when it frustrates or limits the ability of a national

bank to exercise its statutorily granted powers.  See Id. at 33-34; see also SPGGC, LLC v. Ayotte, 488 F.3d 525, 531 (2007).  In particular, under the NBA, these powers include the ability of national banks to charge interest rates authorized by their respective home states, including the interest rates for RALs.  See 12 U.S.C. § 85.  Plaintiff may export and apply those rates for any loans, including RALs, made in any other state in which the national bank does business.  Id.

In granting national banks broad powers to engage in the business of banking, Congress intended to remove from the states any authority to regulate, limit, condition, or in any other way interfere with the exercise of these powers.  See Watters v. Wachovia, 127 S. Ct. 1559 (2007).  Whenever a state law conflicts with the NBA, frustrates the purpose of the NBA, or impairs the efficiency of national banks to discharge its duties, the state law is necessarily voided.  Davis v. Elmira Sav. Bank, 161 U.S. 275, 283 (1896).  "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank regulator's exercise of its powers."  Watters, 127 S. Ct. at 1567.  According to Watters, the NBA is structured "to protect from state hindrance a national bank's engagement in the 'business of banking' whether conducted by the bank itself or by an operating subsidiary, empowered to do only what the bank itself could do."  Id. at 1572.

The issue in this case relates to a national bank's power to lend money; such power flows from the NBA.  12 U.S.C. § 24, 85; 12 C.F.R. §§ 7.4001(b), 7.4009(a).  The power to lend money includes the ability to charge interest for loans made at the rate permitted under the laws of the state where the national bank has its principal place of business.  12 U.S.C. § 85; 12 C.F.R. § 7.4001(b) (commonly referred to as the Export Rule).  The Export

Rule allows a national bank to charge interest on loans at the rate permitted by its home state, even when the national bank makes the loan in another state.  Marquette Nat'l Bank of Minneapolis v. Fist of Omaha Serv. Corp., 439 U.S. 299, 308-09 (1978).

A national bank's home state is either "in the place designated in its 'organization certificate' . . . or in the places in which it has established authorized branches."  Id. at 309 (citation omitted).  Here, it is undisputed that California is Plaintiff's home state because its main office and principal place of business are located there.  Since it is also undisputed that Plaintiff maintains no branches in the state of New Jersey, California law regarding imposition of interest rates determines the amount of the interest Plaintiff may charge the RALs it issues to customers in New Jersey.  See Marquette Nat'l Bank, 439 U.S. at 308-10. While the New Jersey RAL Statute restricts the interest rate on RALs to 30%, see N.J. RAL Statute § 3a, California law does not; under the California Constitution, national banks, such as Plaintiff, are specifically exempted from restrictions on interest rates.  Cal. Const. art. XV § 1; see also Hiatt v. S.F. Nat'l Bank, 361 F.2d 504 (9th Cir. 1966). The instant dispute arises from New Jersey's impermissible restrictions on the interest rates that Plaintiff may charge and resulting civil penalties, which the parties have already stipulated the NBA preempts.[7]  However, as indicated supra, one of the provisions in the Statute imposes criminal liability on "tax preparers", within the definition of the Statute, who fail to comply with the Statute.  State Defendants maintain that such provision survives preemption.  The Court disagrees.

State Defendants refer generally to the dual purposes of criminal statutes:

---

[7] See The Parties' Joint Stipulation and this Court's Order dated March 7, 2008.

punishment and deterrence. Citing to the purpose of the New Jersey Criminal Code, State Defendants argue that by criminalizing egregious usury, the State intends to protect the public, especially the low income working poor and minority consumers, from the harmful effects of excessively high cost loans. Thus, under these circumstances, State Defendants contend that it is reasonable to make a distinction between the preemptive effect of the NBA on state civil usury statutes from criminal usury statutes, such that the NBA's preemptive reach yields to the State's inherent police power to protect its citizens. State Defendants further argue that, at a minimum, the Statue should apply to third party independent tax preparers who assist Plaintiff in making the RAL even if the Statute does not apply to national banks. Therefore, there are two important determinations: First, is the criminal provision in the Statute that applies directly to national banks preempted by the NBA? Second, does the NBA also preempt the criminal provision that applies to third party tax preparers?

With respect to the criminal provision as it applies to national banks, the Court finds that the Statute is duly preempted by the NBA. The Statute defines a "tax preparer" as an individual or corporation that "provides tax preparation services." N.J. RAL Statute § 1. In turn, the Statute defines "tax preparation services" broadly to include not only those "services" involving the preparation of a tax return, but also the act of "offer[ing], facilitat[ing], or mak[ing] refund anticipation loans." N.J. RAL Statute § 1(3). Clearly, based on that broad definition, the Statute contemplates that Plaintiff, a national bank which offers, facilitates, or makes RALs, is a "tax preparer." Accordingly, on its face, the Statute imposes criminal charges on national banks for violating any provision of the Statute.

Due to the controversy surrounding the wisdom and pitfalls of RALs, and the plethora of attention drawn to this issue, many states have attempted to address this dilemma. As of 2007, there were ten states regulating RALs: California, North Carolina, Minnesota, Wisconsin, Illinois, Nevada, Oregon, Virginia, Washington and Connecticut. With the exception of Connecticut, these laws primarily rely on disclosure to protect consumers from RAL abuses.[8] In fact, by Defendants' own calculations, consumers are paying fees equivalent to 115% APR in order to obtain their tax refund days before checks would be issued by the IRS. Such practice raises serious concerns which have caused these states, and New Jersey, to pass regulations to curtail the seemingly usurious nature of these loans. Primarily, these states have endeavored to ensure that their residents are fully informed about the differences between an RAL and simple electronic filing of refunds and the inherent high cost of the loans. See North Carolina Association of Electronic Tax Filers, Inc. v. Graham, 333 N.C. 555, 566 (1993)(state comprehensive disclosure requirements on RALs are held to be constitutional );see also N.C. Gen. Stat. §§ 53-245 to 53-254; Wis. Stat. §§ 421.301 and 422.310; Minn. Stat. § 270.30; Comp. Stat. Ann. Ch. 815, § 177/1, et seq.; Va St. § 6.1-474; Conn. Gen. Stat. § 42-480(d) and (e); Ore. Rev. Stat. 673.605; Revised Code of Washington § 19.265.010, et seq.; Cal. Bus. & Prof. Code § 2225, et seq.

However, unlike the other states' regulations, the New Jersey RAL Statute directly imposes criminal penalties on those who violate the Statute. While the OCC regulations acknowledge that state criminal laws may apply to national banks in very limited instances,

---

[8]Similarly, regulators in Massachusetts and Oklahoma have issued warnings regarding RALs.

see 12 C.F.R. §§ 7.4007, 7.4008, 7.4000, these regulations clearly indicate that state criminal statutes may only apply to national banks if they "incidentally affect" a national bank's exercise of its federally granted powers.   12 C.F.R. §§ 7.007(c), 7.4008(e), 7.4009(c)(2).  In explaining the extent to which state criminal laws may apply to national banks, the OCC regulations cite to, and quote from, the Supreme Court's opinion, Easton v. Iowa, 188 U.S. 220, 238 (1903).  The Supreme Court, in Easton, recognized that states have "the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction . . . [and] likewise . . . may declare, by special laws, certain acts to be criminal offences when committed by officers or agents of its own banks and institutions." Id. at 239.  Nevertheless, states are "without lawful powers to make such special [criminal] laws applicable to banks organized and operating under the laws of the United States." Id. Notwithstanding the public policy considerations, and that usury under this State's laws is a crime, the Statute here directly restricts and frustrates Plaintiff's power to make RALs under the NBA, and does not merely "incidentally affect" Pacific Capital.

Indeed, the criminal provision of the Statute, N.J. RAL Statute § 3a (references New Jersey's Code of Criminal Justice Section 2C:21-19), just like its civil counterpart, N.J. RAL Statute §§ 3a and 5, imposes substantial penalties on Plaintiff for charging fees and interest on a customer's anticipated tax refund loan above 30%, in direct contravention of the NBA. See 12 U.S.C. §§ 24, 85; 12 C.F.R. § 7.4001(b); see also 12 C.F.R. § 7.4002(d); Marquette Nat'l Bank, 439 U.S. at 308-09.  The Supreme Court has made clear that because Plaintiff is a national bank, "'it is an [instrumentality] of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United states.'" Marquette Nat'l Bank, 439 U.S. at 308 (quoting Davis Elmira Savings Bank, 161

U.S. 275, 284 (1896)); see also Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 10-11 (2003)("In addition to this Court's longstanding and consistent construction of the National Bank Act as providing an exclusive federal cause for usury against national banks, this Court has also recognized the special nature of federally chartered banks").  Since the criminal provision of the Statute would clearly and significantly impair the exercise of Plaintiff's authority enumerated under the NBA, the Statute must give way.  See Watters, 127 S. Ct. at 1567; see also Pacific Capital Bank v. Connecticut, No. O6-0028, 2006 U.S. Dist. 55627, at *16-20 (D. Conn. Aug. 10, 2006)(dealing with a similar Connecticut statute, the court held that clearly "a state law which regulates the interest rate that a national bank can charge on an RAL is preempted by federal law").  Moreover, if the Court were to accept such distinction, it would invite state legislatures to import criminal sanctions into statutes that would otherwise be preempted by the NBA.  Such end-run around the NBA would render the federal preemption doctrine in this context meaningless.  Therefore, New Jersey's effort to circumvent the NBA by imposing a criminal provision is unconstitutional and unenforceable.

The Court also disagrees with State Defendants that even if national banks are not subject to the criminal sanction, third party tax preparers that assist national banks in making the RALs are nonetheless bound by the provision.  State Defendants cite primarily to SPGGC v. Blumenthal, 408 F.Supp. 2d 87, 95 (D. Conn. 2006) aff'd in part, vacated in part, 505 F.3d 183 (2d Cir. 2007) for the proposition that preemption of state law by the NBA does not apply to a non-bank entity, even if it has an agency relationship with a national bank.  However, such support is misplaced.  In Blumenthal, the Second Circuit dealt with the conduct of a third party seller of gift cards, whose actions were independent

13

of the seller's relationship with the national bank, which issued the gift cards.  While the court there ultimately held that the NBA did not preempt the state's attempt to regulate the seller's conduct, the court stated that the inquiry in the preemption analysis is "whether the regulation at issue actually affects the national bank's exercise of any authorized powers or whether it limits only activities of a third party which are otherwise subject to state control." Blumenthal, 505 F.3d at 191.  The court also stated that "[i]t is possible that, in certain instances, a national bank's decision to carry out its business through an unaffiliated third party . . . might constitute an exercise of the bank's incidental powers under the NBA." Id. at 190.  This case presents that instance.

While the Third Circuit has not had the occasion to speak on this issue, other courts have held that restrictions that are placed on agents of the national banks who carry out the banks' powers under the NBA, indirectly regulate the banks' business and therefore, are preempted by the NBA.  See Ayotte, 488 F.3d at 532 (First Circuit held that NBA gives national banks the power to engage third party agents to exercise its incidental powers); Cades v. H & R Block, 43 F.3d 869, 873-74 (4th Cir. 1994)(finding that 12 U.S.C. § 85 requires that a national bank's home state usury law apply, when the bank had used out-of-state agents to engage in "face-to-face solicitation of . . . consumers"); 12 C.F.R. § 7.1014 (allowing agents to send bank-issued money orders).  Most persuasive is the reasoning in Pacific Capital Bank v. Connecticut, wherein the Connecticut Court, confronted with a similarly worded state Statute prohibiting third party tax preparers from assisting national banks in making RALs, found that because "the services of an experienced tax preparer are 'indispensable' for the good faith and error free preparation of an RAL," the state's attempt to limit third party businesses from facilitating national banks significantly interfered with

14

the bank's power under the NBA.  Pacific Capital, 2006 U.S. Dist. 55627 at 28-29, 39.

While the court in Pacific Capital, dealt with civil penalties given to, and restrictions on, third party tax preparers, which State Defendants have candidly agreed that the NBA preempts, the State Defendants' argument that the criminal provision differs in analysis and result is unavailing.  A Congressional statute, such as the NBA, can be in "irreconcilable conflict" with state law if (a) compliance with both state and federal law is a "physical impossibility," or (b) the state law may "stand as an obstacle to the accomplishment and execution of the full purposes and objective of Congress."  Barnett Bank, 517 U.S. at 31; Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982).  Having previously determined that Plaintiff is within its powers under the NBA to engage the assistance of third party tax preparers and for the same reasons that the Statute's criminal provision encroaches upon Plaintiff's right to make RALs in New Jersey, the criminal provision as applied to third party tax preparers also significantly interferes with Plaintiff's ability to exercise Congressionally granted powers.  See Barnett Bank, 517 U.S. at 33.  As such, the Court holds that by the Statute criminalizing the actions of third party tax preparers, who are Plaintiff's main partners in making RALs, the Statute stands as an obstacle to allowing Plaintiff to charge the interest rates permitted under the NBA.  See 121 C.F.R. § 7.4009 (states may not obstruct, impair, or condition a national bank's right to charge the interest rates allowed under the NBA).   Accordingly, N.J. RAL Statute § 3a imposing criminal penalties on national banks and third party tax preparers is preempted by the NBA.  All other provisions of the Statute, except as noted herein, are unaffected by this Opinion.  See Joint Stipulation at ¶ 3 ("the parties agree that [Plaintiff's] challenge to the New Jersey RAL Statute is limited to the Constitutionality of the interest rate limitations, and the civil and criminal penalties

15

imposed by the Statute against national banks issuing refund anticipation loans . . . and the related ability to utilize tax preparation businesses that facilitate these RALs on their behalf").

As a final note, while State Defendants' argument with regard to public policy is a compelling one, the Supreme Court made clear 30 years ago, in <u>Marquette Nat'l Bank</u>, that "the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 [of the NBA] to further that end is better addressed to the wisdom of Congress than to the judgment of [the] Court." <u>Marquette Nat'l Bank</u>, 439 U.S. at 319.

Dated March 12, 2008

/s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.

.

16